UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MILDRED JUARBE A/K/A<br>MILDRED J. JUARBE MASS, | : | |
| | : | |
| Plaintiff, | | |
| | : | |
| vs. | | No. 3:10CV1557(MRK)(WIG) |
| | : | |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | : | |
| | | |
| Defendant. | : | |

-----------------------------------------------------X

RECOMMENDED RULING ON PENDING MOTIONS

On January 10, 2008, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging that she had been disabled since August 31, 2006. Plaintiff's application was denied initially and again on reconsideration. An administrative hearing was held on September 29, 2009, before Administrative Law Judge ("ALJ") Robert A. DiBiccaro, at which Plaintiff, who was represented by counsel, testified through an interpreter. On February 26, 2010, the ALJ issued his decision, finding that Plaintiff was capable of performing her past relevant work as a production assembler and, therefore, was not under a disability from August 31, 2006, through the date of his decision (R. 21). The Decision Review Board accepted Plaintiff's claim for review but, on June 3, 2010, issued a notice that it had not completed its review within the prescribed 90-day period. See 20 C.F.R. § 405.420(a)(2)(2010). Thus, the decision of the ALJ became the final, appealable decision of the Commissioner. Id. Plaintiff then sought review in this Court pursuant to 42 U.S.C. § 405(g).

Now pending before the Court are Plaintiff's Motion for Order Reversing the Decision of

the Commissioner [Doc. # 18] and Defendant's Motion to Affirm the Decision of the

Commissioner [Doc. # 19]. For the reasons set forth below, the Court recommends that

Plaintiff's motion be granted and this matter remanded for further administrative proceedings.

Standard of Review

In ruling on the pending motions, this Court must first determine whether the correct

legal standards were applied by the ALJ and then determine whether substantial evidence in the

record supports the decision of the ALJ. 42 U.S.C. § 405(g) ("The findings of the Commissioner

of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....");

see Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); Balsamo v. Chater, 142 F.3d 75, 79 (2d

Cir. 1998). "A district court reviewing a final [Social Security Administration] decision

pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an

appellate function." Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981). It is not this

Court's function to determine de novo whether the claimant was disabled nor to substitute its

opinion for that of the Commissioner. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). In

determining whether the Commissioner's decision is supported by substantial evidence, the

Court must consider the entire record, examining the evidence from both sides. Williams v.

Bowen, 859 F.2d 255, 258 (2d Cir. 1988). Substantial evidence means "more than a mere

scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence need not

compel the Commissioner's decision; rather substantial evidence need only be that evidence that

"a reasonable mind might accept as adequate to support [the] conclusion" being challenged. Id.;

Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations

omitted).

<u>Discussion</u>

The initial issue raised by Plaintiff is that the ALJ erred in failing to find that she had any "severe" physical impairments. Because the Court is persuaded by Plaintiff's argument that substantial evidence does not support the ALJ's determination that Plaintiff did not have a "severe" physical impairment, the Court recommends remanding this case to the Commissioner for further proceedings. Accordingly, the Court need not address the remaining issues raised by Plaintiff.

At step two of the sequential evaluation process, <u>see</u> 20 C.F.R. § 404.1520, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). This is often referred to as the "severity regulation." <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987). An impairment or combination of impairments is "not severe" if the medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 404.1521; SSR 85-28; SSR 96-3p. Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). The Social Security Administration has provided additional guidance in Social Security Ruling 96-3p:

> A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (<u>i.e.</u>, the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related

> symptom(s) impose on the individual's physical and mental ability
> to do basic work activities. . . . If the adjudicator finds that such
> symptoms cause a limitation or restriction having more than a
> minimal effect on an individual's ability to do basic work
> activities, the adjudicator must find that the impairment(s) is
> severe.

Thus, the severity determination is based solely on medical factors, not vocational factors, such as age, education, and past work experience. 20 C.F.R. § 404.1520(c). The Second Circuit, along with almost every other Circuit Court, has repeatedly held that the severity regulation must be applied to do no more than screen out de minimis claims. See Dixon v, Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing cases); see also Wright v. Barnhart, No. 3:05cv1487, 2006 WL 4049579, at *12 (D. Conn. Dec. 14, 2006).

Here, the ALJ found that Plaintiff had only one severe impairment, that being depression, which he found "has more than a minimal effect on her ability to perform work-related activities" (R. 17). The ALJ addressed her complaints of physical pain, including her lower back pain, but noted that no diagnostic imaging had been performed and that Plaintiff's complaints were sporadic and generally short-lived (R. 17). He further observed that many of her complaints pre-dated her alleged onset date by up to four years and that she mentioned no problems with her back or other bodily areas at the hearing (R. 17). Thus, he did not include any physical impairments as "severe" impairments at step two.

The ALJ's failure to recognize a "severe" physical impairment is not surprising, as Plaintiff herself made little mention of one. In a Disability Report submitted on January 22, 2008, Plaintiff identified depression as the only illness, injury or condition that limited her ability to work. She stated that due to this condition, she lacked the motivation to work (R. 225). She reported no physical impairments affecting her ability to work. In an Activities of Daily

Living & Symptoms Questionnaire dated February 11, 2008, Plaintiff indicated that her memory, understanding, concentration, and ability to get along with others were the work-related functional abilities affected by her illnesses, injuries, or conditions (R. 237). Significantly, she did not note any physical limitations, such as lifting, walking, squatting, reaching, standing, stair climbing, etc. (R. 237). Plaintiff also completed a Symptom Questionnaire in which she listed her symptoms as "depressed, anxiety, fear to be alone, panic attacks" (R. 240). Again, there was no mention of a physical impairment.

When Plaintiff appealed the initial denial of her claim, she completed an undated Disability Report - Appeal and indicated that she did not have any new illnesses, injuries, or conditions (R. 267). As for changes in her daily activities, she responded, "I get anxious when I am alone, and can't sleep at night. Sometimes I lose my memory" (R. 270). She did, however, list Motrin 800 as a medication that she was taking for pain (R. 269).

Prior to the administrative hearing, Plaintiff's counsel submitted a Pre-Hearing Memorandum, in which he listed her medical impairments as "nerves, panic attacks, and depression" (R. 273-74). He did not mention a single physical condition or impairment. During the administrative hearing, her counsel again asserted that her mental impairments precluded her ability to work (R. 93). His statements were supported by Plaintiff's testimony that "the panic attacks, [her] nerves, a lot of people, [and her] depression" prevented her from working (R. 98).[1] Presumably because Plaintiff was not alleging any physical impairments, her counsel never inquired as to any. However, at the end of the hearing, after the ALJ asked her about her past employment, on re-examination her attorney asked if she could perform any of her former jobs,

---

[1] See also Plaintiff's testimony at R. 98-100.

to which she responded "no" and added "also because I have muscular pain" (R. 103). This

response was the only mention of any physical limitation precluding Plaintiff's ability to work.

Thus, throughout the entire administrative proceedings, other than this single reference

to "muscular pain" at the hearing, Plaintiff's entire disability claim was based solely upon her

mental impairment. Plaintiff now argues that the ALJ erred in failing to find a severe physical

impairment at step two of the sequential evaluation process. Specifically, she points to her

history of spina bifida occulta,[2] and pelvic and abdominal pain dating back to 2002.

1. Plaintiff's History of Spina Bifida Occulta

With respect to Plaintiff's history of spina bifida occulta, the medical records from 2002 -

more than four years prior to her alleged onset date - contain two references to a history of spina

bifida occulta. They indicate that in 1980, while Plaintiff was living in Puerto Rico, she was told

that she had been diagnosed with spina bifida occulta by x-ray (R. 355, 360). There is also a

mention of spina bifida occulta as PMH [past medical history] in another undated record from

Fair Haven Community Health Clinic (R. 451), which based on Plaintiff's stated age, appears to

have been from 2008. Although the Court has no reason to doubt this diagnosis, there is no

medical evidence in the record to support this diagnosis. More importantly, there is no evidence

of any symptoms, treatment, or functional impairment associated with this diagnosis. In fact, the

reference in the Fair Haven Community Health Clinic progress notes from April 24, 2002,

---

[2] Spina bifida occulta is the mildest and most common form of this disorder. It usually only
involves a minor fault with one or two of the vertebrae and it usually shows no symptoms and
does not require treatment. Spina bifida occulta literally means "a hidden spot on the spine," and
for most people, this spot will remain hidden. It has been estimated that approximately 10
percent of the American population has spina bifida occulta and that most are not even aware
they have it. http://my.clevelandclinic.org/disorders/spina_bifida/hic_spina_bifida.aspx.

mentions her history of spina bifida occulta and then adds that she was not having any problems

with her lower back (R. 360).

A fundamental requirement for a finding of disability under Title II of the Social Security

Act is that a claimant's inability to do any substantial gainful activity must be "by reason of any

medically determinable physical or mental impairment." 20 C.F.R. § 404.1505(a). Such an

impairment "must result from anatomical or physiological . . . abnormalities which can be shown

by medically acceptable clinical and laboratory techniques." 20 C.F.R. § 404.1508.[3] Here, there

is no medical evidence in the record to substantiate this diagnosis or any evidence of symptoms

or functional limitations caused by this condition.

According to the medical literature, spina bifida occulta is a condition that often shows

no symptoms and usually does not require treatment.[4] Without any evidence that this condition

---

[3] See also SSR 96-4p, which provides:

> In the absence of a showing that there is a "medically determinable
> physical or mental impairment," an individual must be found not
> disabled at step 2 of the sequential evaluation process. No
> symptom or combination of symptoms can be the basis for a
> finding of disability, no matter how genuine the individual's
> complaints may appear to be, unless there are medical signs and
> laboratory findings demonstrating the existence of a medically
> determinable physical or mental impairment.

[4] See Note 2, supra. See also http://www.spinabifidaassociation.org/site/c.liKWL7PLLrF/
b.2700275/k.5F64/Spina_Bifida_Occulta.htm:

> Spina Bifida Occulta is a common condition, occurring in 10% -
> 20% of otherwise healthy people; it is often found incidentally
> during a radiogram (X-Ray) of the lower back. By definition
> "Spina Bifida Occulta" means "hidden split spine." The term is
> misleading because it is used to describe several conditions. The
> most frequently seen form is considered harmless and is simply a
> variant of normal *vertebral (bone) anatomy.* In this condition, parts
> of the bones of the spine called the spinous process and neural arch
> appear abnormal on a radiogram. Usually, the spinal cord, and

was impacting Plaintiff's ability to perform work-related activities, it was properly excluded by the ALJ from the list of "severe" impairments.

2.  Plaintiff's History of Pain

As for Plaintiff's medical history of pelvic and abdominal pain, the medical evidence does support a diagnosis of symptomatic uterine fibroids in 2002 and from 2004 to 2005 (R. 330-31, 346-47).  In June 2006, prior to her alleged date of onset of disability, Plaintiff underwent a total abdominal hysterectomy and had no problems with the surgery (R. 307).

Following her alleged onset date, the medical records indicate that between 2007 and 2009 Plaintiff was repeatedly treated for back, pelvic, and abdominal pain. In January 2007, Plaintiff was treated at the Fair Haven Medical Clinic for left-sided lower abdominal pain of approximately one week duration that was radiating into her left leg and back (R. 305).  On January 23, 2007, Plaintiff was again seen for left lower quadrant pain that ran down her leg. She was diagnosed with pelvic adhesions on the left side with consideration being given to laproscopic lysis (R. 303).  On February 13, 2007, Plaintiff continued to complain of left-sided pelvic pain with associated back pain (R. 301).  A transvaginal ultrasound revealed an ovarian cyst on the right side (R. 301).  Darvocet was prescribed for the back pain (R. 301, 386).  In March 2007, Plaintiff was seen for the ovarian cyst, but the treatment notes indicate that the "patient's real concern is pelvic pain times two months, QD [every day]"  (R. 298).  Pain was reported with physical activity, and the doctor stated that he would prescribe Elmeron for

_____

spinal nerves are not involved. Isolated bony Spina Bifida Occulta (without an underlying spinal cord abnormality) does not lead to problems with the nervous system.

interstitial cystitis[5] (R. 298). In April, Plaintiff continued to report severe abdominal and back pain that was rated 10 out of 10 on a pain scale. She was "very uncomfortable." She reported a small improvement with Pyridium. She was to return in a week for a follow-up appointment for her "chronic pelvic pain" (R. 295). In May, a course of DMSO treatment[6] was commenced (R. 293). At Plaintiff's next appointment, she reported beneficial effects from the treatment but continued to have some tenderness and urinary urgency (R. 291). Based on Plaintiff's "excellent response" to the first DMSO treatment, a second treatment was undertaken in late May 2007 and a third in July 2007 (R. 289, 285).

In February 2008, Plaintiff was still complaining of pain on urination (R. 401). In May, Plaintiff reported left lower quadrant pain of recent onset (R. 478). In May and June 2008, she received massage therapy at Fair Haven Community Health Clinic to address pain and soreness in her neck and upper back (R. 393, 470). A note from July 14, 2008, indicates that Plaintiff was requesting additional massage therapy but she was advised that there was no more massage therapy available (R. 469). In early August, Plaintiff complained of neck and arm pain and headaches (R. 480). An undated note from 2008[7] states that Plaintiff complained of "[illegible], neck pain & muscle tension for many months" (R. 468). The doctor's assessment was muscle spasm at neck and shoulders, for which he prescribed Soma, 250 mg., twice a day for two weeks,

---

[5] Interstitial cystitis (IC) is a painful condition due to inflammation of the tissues of the bladder wall. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001508/.

[6] DMSO [dimethyl sulfoxide] treatments involve placing the prescription medication into the bladder through a thin, flexible tube inserted through the urethra, in an effort to reduce inflammation and possible prevent muscle contractions that cause frequency, urgency, and pain. http://www.mayoclinic.com/health/interstitial-cystitis/DS00497/DSECTION=treatments-and-drugs.

[7] This office visit was probably on or around August 21, 2008, as there was a prescription for Soma written on that date (R. 466).

and "consider physical therapy" (R. 468).   On August 28, 2008, Plaintiff presented at triage with complaints of incontinence "with just walking" and acute left-sided back pain radiating into the left "glut" (R. 481, 465).  She was advised to use heat, decrease her activity, and take Motrin (R. 465).  A note of a phone call to triage in October 2008, indicated that Plaintiff was complaining of left-sided pelvic pain.  She was scheduled for an appointment the following day (R. 463).  A December 2008 record notes complaints of lower back pain and abdominal pain refractory to medication.  Straight leg raising caused increased pain on the left side.  The diagnosis was lumbago, and Plaintiff was to follow up in early January for her back pain.  This report also noted abdominal pain, questionably related to her back pain.  The doctor's notes "sounds as if chronic issue, unchanging" (R. 460).

In mid-January 2009, a prescription was written for pain medication, Ibupofin, 800 mg., to be taken three times daily (R. 457).   In February 2009, a report from Yale-New Haven Hospital on x-rays of her cervical spine indicated "mild straightening of the normal cervical lordosis which is consistent with muscle spasm" (R. 446).  In May 2009, Plaintiff was seen at the Fair Haven Community Health Clinic for joint pain.  Her prescription for Tramadol, used to treat moderate to severe pain,[8] was increased (R. 455).  Later that month, Plaintiff reported a flare-up of left-sided low back pain and hip pain (R. 454).  On May 26, 2009, she was seen at the Fair Haven Community Health Clinic's emergency department for an acute onset of left-sided lower back pain and left hip and thigh pain.  The record indicates that Motrin 600 mg. had not been helpful and that Plaintiff was afraid to take the Tramadol, given her other medications (R. 453).

---

[8] http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/.

She was diagnosed with sciatica and Naprosyn[9] was prescribed (R. 453). June 4, 2009, treatment

notes indicate back pain radiating down the left leg (R. 452, 488). The clinician's note states

that the back pain is "very chronic" and appears to be stress exacerbated. The clinician also

reported "history of inappropriate medication use" (R. 452). No further explanation is provided.

The last medical record is from July 15, 2009, and indicates a recurrence of stress incontinence

(R. 489).

An undated document in the administrative record lists Plaintiff's then current

medications as Cymbalta,[10] Clonazepam,[11] Tramadol,[12] Soma,[13] Naproxyn,[14] Detrol,[15] and

Motrin.[16]

Additionally, while the evaluations of Plaintiff's treating licensed clinical social worker,

Juan Diaz, primarily concern Plaintiff's mental impairments, he does note in his May 19, 2008,

---

[9] Naproxyn in a non-steroidal anti-inflammatory used to relieve pain, tenderness, inflammation, swelling and stiffness caused by osteoarthritis and a number of other conditions. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/.

[10] Cymbalta is used to treat depression and generalized anxiety disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/.

[11] Clonzepam is used alone or in combination with other drugs to control seizures and relieve panic attacks. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/.

[12] See Note 8, supra.

[13] Soma is a muscle relaxant used with rest, physical therapy, and other measure to relax muscles and relieve pain and discomfort cause by strains, sprains, and other muscle injuries. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717/.

[14] See Note 9, supra.

[15] Detrol is used to relieve urinary difficulties, including frequent urination and inability to control urination. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001052/.

[16] Motrin is used to relieve pain, tenderness, swelling, stiffness, caused by osteoarthritis and other causes, and to relieve mild to moderate pain. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598/.

evaluation, that Plaintiff "has been out of work for some time [due to] physical and emotional problems" (R. 421) (emphasis added).

After a thorough review of the administrative record, the Court finds that the ALJ's conclusion that Plaintiff's only severe impairment was her depression is not supported by substantial evidence in the record. Heeding the admonitions of the Second Circuit that the severity regulation should only be used to screen out de minimis claims, Dixon, 54 F.3d at 1030, the Court finds that Plaintiff's well-documented history of back and abdominal pain should have been considered by the ALJ as a "severe" impairment. "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97CV5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Yuckert, 482 U.S. at 154 n. 12); see also SSR 85-28; 20 C.F.R. § 404.1520a. Over the course of two and one-half years, following her alleged date of onset of disability, Plaintiff was treated for complaints of back and/or pelvic and abdominal pain on at least twenty occasions. Pain medications were prescribed; massage therapy was prescribed; Plaintiff underwent three bladder instillations with DMSO for her interstitial cystitis; x-rays from Yale-New Haven Hospital demonstrated mild changes consistent with muscle spasm; her doctors described her abdominal pain as a "chronic issue, unchanging" (R. 460) and "very chronic" (R. 452). And, at the administrative hearing, Plaintiff did testify through an interpreter that she did not think she could perform her past work because of "muscular pain" (R. 103).

In light of her testimony and the medical evidence of record, the Court concludes that substantial evidence does not support the ALJ's conclusion to exclude her back, abdominal, and pelvic pain as "severe" impairments at step two. The Court emphasizes, however, that this

holding is not a finding that Plaintiff is "disabled" as a result of her physical impairments. That is a determination that must be made by the Commissioner and will have to be addressed on remand.

Conclusion

Accordingly, for the reasons set forth above, the Court recommends that Plaintiff's Motion for an Order Reversing the Decision of the Commissioner [Doc. # 18] be GRANTED and that this matter be remanded for further administrative proceedings. The ALJ should be instructed to include Plaintiff's physical impairments of back, abdominal, and pelvic pain as "severe" impairments at step two and to then proceed with the sequential evaluation of her claim. The Court further recommends that Defendant's Motion to Affirm [Doc. # 19] be DENIED.

This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1). Any objection to this Recommended Ruling must be filed within 14 days after service. See Fed. R. Civ. P. 72(b)(2) and 6(d). If this Recommended Ruling is approved by the District Judge, the Clerk should then enter a separate judgment in favor of the Plaintiff in this matter under Rule 58(a), Fed. R. Civ. P., and remand this matter back to the Commissioner for further administrative proceedings consistent with this Ruling.

SO ORDERED, this ___30th___ day of August, 2011, at Bridgeport, Connecticut.


 /s/ *William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge